HENRY TOPHAM, Appellant, *v.* THE INTERURBAN STREET RAILWAY Co., Respondent.

(Supreme Court, Appellate Term, January, 1904.)

Railroad Law — Section 104 as to free transfers — Its application to certain street railways in New York city — Police power to regulate fares — Section applicable to a lease as distinguished from a traffic contract — Applicable to a corporation, however incorporated, having a right to operate a railroad in the State of New York — Consolidating under the Railroad Law waives prior statutory rights of constituent companies.

The Broadway and Seventh Avenue street railway, in the city of New York, and the 23d street line, both of which acquired franchises under statutes passed respectively in 1860 and 1866 and in 1869 and 1873 and went into operation in 1872, were leased in 1890 and 1893 by the Houston, West Street and Pavonia Ferry R. Co. and by subsequent consolidation agreements, made on and after Nov. 23, 1893, and expressly stated to have been made " as provided by the Railroad Law ", became merged in the first and second and then in the present Metropolitan St. R. Co. which, in 1902, leased its lines within the city limits to the defendant, the Interurban St. R. Co., a corporation organized in 1891 under the Stock Corporation Law to take and possess the property and franchises of one street railway situate in the county of Westchester, wholly without the city limits and not physically connected with either of the leased lines in question. A passenger of the defendant, having been refused a free transfer between the first mentioned lines at their intersection at Broadway and 23d street, sued for the penalty imposed for a refusal by the Railroad Law (L. 1890, ch. 565, § 104, as amd. by L. 1892, ch. 676) but was defeated below.

Held, that section 104 applied to the defendant and that it was liable.

That its contention, that because the Broadway and Seventh Avenue line and the 23d street line received their franchises by special acts from the Legislature before the passage of L. 1885, ch. 305, § 4, relative to transfers and which finally became section 104 of the Railroad Law, they and the Metropolitan St. R. Co. had vested rights to maintain a certain rate of fare and could not subsequently be compelled by the Legislature to give transfers in addition thereto, was untenable as art. VIII, § 1 of the State Constitution of 1846 and 1 R. S., tit. 3, ch. 18, § 8, made applicable to railroad companies by L. 1850, ch. 140, § 1, declare in substance that any general law or special act or charter relative to corporations may be altered or repealed and that consequently the Legislature had a right under the police power subsequently to prescribe transfers as a regulation of the rate of fare.

That although the instrument executed by the Metropolitan St. R. Co. to the defendant was a lease pure and simple, and not a traffic contract between companies each retaining its own line, section 104 applied to a lease as well as to a traffic contract and required the defendant to give free transfers at the point in question.

That section 104 applied to railroad corporations and to all other corporations within this State which, while formed under some law other than the Railroad Law, have a right to own or operate a railroad within this State.

That the clause at the end of section 104 that " The provisions of this section shall only apply to railroads within the limits of any one incorporated city or village " referred to railroads and not to corporations and was added, when the right to lease was extended to every corporation owning a railroad within this State, to prevent the right of transfer for a single fare from fastening itself upon long lines of country railroads.

That by consolidating under the Railroad Law both the Metropolitan St. R. Co. and its constituent companies became subject to that law and waived the privileges, if any, possessed by them under prior laws.

APPEAL by the plaintiff from a judgment of the Municipal Court of the city of New York, second district, borough of Manhattan, in favor of the defendant in an action to recover penalties based upon the refusal of the defendant to furnish the plaintiff with transfers from one line to another operated by the defendant.

Edward B. Whitney and Frank L. Mahan, for appellant.

Paul D. Cravath and Joseph P. Cotton, Jr., for respondent.

FREEDMAN, P. J.  The plaintiff appeals from a judgment of the Municipal Court in favor of the defendant in an action to recover penalties based upon repeated refusals by the defendant to furnish the plaintiff with transfers from one railroad line to another at the intersection of Broadway and Twenty-third street in the city of New York.  The action was based upon the provisions of section 104 of the Railroad Law (Laws of 1890, chap. 565).  The plaintiff on each occasion was a *bona fide* passenger, but, even if he had ridden for the very purpose of obtaining a penalty, he was, under the decision of Fisher v. N. Y. C. & H. R. R. R. Co., 46 N. Y. 644, entitled to recover, if the defendant was legally bound to transfer him.  .

The fact that there was another route embraced within the defendant's system, over which the plaintiff on each occasion might have traveled for a single fare, can make no difference, and the fact that the giving of transfers at the point in question might cause undue crowding in the street and at the crossings is no excuse for not giving them, unless sanctioned by legislative action.  The only question, therefore, requiring serious consideration is whether the defendant is bound under section 104 of the Railroad Law to furnish transfers from the Twenty-third Street line to the Broadway line, and *vice versa,* at the point where these lines cross each other at Broadway and Twenty-third street.

For the purpose of determining this question it is important to have a clear view of the precise relation of the defendant to the lines in question and of the status of each line with respect to the application of section 104 of the Railroad Law.  The Broadway line is owned by the Broadway and Seventh Avenue Railroad Company, which was incorporated in 1864, acquired its franchise under special acts of the Legislature, viz., chapter 513 of Laws of 1860, and chapter 500 of Laws of 1866, and began the operation of its line in 1872.  In 1890 its line was leased to the Houston, West Street and Pavonia Ferry Railroad Company, which was subsequently consolidated with certain other companies into the Metropolitan Street Railway Company.

Supreme Court, Appellate Term, January, 1904.    [Vol. 42.

The Twenty-third Street line is owned by the Twenty-third Street Railway Company, which was incorporated in 1872, acquired its franchise to operate its line under chapter 823 of the Laws of 1869 and chapter 100 of the Laws of 1873, and began the operation of its line in 1872.

In 1893 its line was leased to the Houston, West Street & Pavonia Ferry Railroad Company, which had previously become the lessee of the Broadway line, as already stated. By a consolidation agreement, dated November 29, 1893, between the Houston, West Street and Pavonia Ferry Railroad Company, the Broadway Railway Company, and the South Ferry Railroad Company, the first Metropolitan Street Railway Company was formed. By consolidation agreement of May 18, 1894, between the first Metropolitan Street Railway Company, The Metropolitan Cross Town Railway Company and the Lexington Avenue and 'Pavonia Ferry Railroad Company, the second Metropolitan Street Railway Company was formed. By consolidation agreement of November 7, 1895, between the Metropolitan Street Railway Company last mentioned and the Columbus and Ninth Avenue Railroad Company, the present Metropolitan Street Railway Company was formed.

Each of said consolidation agreements was in express terms made " as provided by the Railroad Law," and in each case the capital stock, franchises and property of the contracting corporations were merged and consolidated and accepted and received by the new company subject to all the charges thereon and the duties and liabilities incurred by each of the contracting corporations.

In April, 1902, the Metropolitan Street Railway Company of 1895 (the product of the several consolidations referred to) leased its lines then operated by it within the limits of the boroughs of Manhattan and The Bronx to the Interurban Street Railway Company.

The defendant, the Interurban Street Railway Company, was organized in 1891 under the Stock Corporation Law (Laws of 1890, chap. 564), to take and possess the property and franchises of a street railroad running from Mount Vernon to Tuckahoe, in Westchester county.

This is the only line of railroad owned by it, and it lies entirely outside of the city of New York, and does not physically connect with either the Broadway line or the Twenty-third Street line.

Section 104 of the Railroad Law (Laws of 1890, chap. 565), as amd. by Laws of 1892, chap. 676, reads as follows: "§ 104. Contracting corporations to carry for one fare; penalty. Every such corporation entering into such contract shall carry or permit any other party thereto to carry between any two points on the railroads or portions thereof embraced in such contract any passenger desiring to make one continuous trip between such points for one single fare, not higher than the fare lawfully chargeable by either of such corporations for an adult passenger. Every such corporation shall upon demand, and without extra charge, give to each passenger paying one single fare a transfer, entitling such passenger to one continuous trip to any point or portion of any railroad embraced in such contract, to the end that the public convenience may be promoted by the operation of the railroads embraced in such contract, substantially as a single railroad with a single rate of fare. For every refusal to comply with the requirements of this section the corporation so refusing shall forfeit fifty dollars to the aggrieved party. The provisions of this section shall only apply to railroads wholly within the limits of any one incorporated city or village."

Under the concluding sentence of said section it is clear that inasmuch as the line of the defendant is entirely outside the city limits, the defendant would not be bound to furnish transfers to it from the lines acquired under leases from the Metropolitan Company, or *vice versa,* even if all of said lines were physically connected. But that fact does not take from the operation of the statute, if otherwise applicable, the system of leased railroads which are wholly within the city limits. The lease from the Metropolitan Company to the defendant was not a contract for the use of their respective routes, and there were no railroads of the respective parties on which there were two points between which passengers could be carried or which could be operated as a single rail-

road, and consequently there was no traffic contract between the parties.

· It was, for the purposes of this case, a lease, pure and simple. The defendant insists that the leases of the Broadway line and the Twenty-third Street line created no obligation to permit free transfers in respect of those lines, because in each case the lessor company acquired its franchise from the State and began the operation of its line prior to the enactment of the statute in relation to transfers, which finally became section 104 of the Railroad Law, and that consequently the Legislature could not by subsequent legislation impose the duty upon the Metropolitan Street Railway Company to give transfers at the point now under consideration.

And it is further contended that in no aspect of the case can the provisions of section 104, as to transfers, be enforced against the defendant.

The main reliance of the defendant is upon the opinion of Parker, Ch. J., of the Court of Appeals, in Ingersoll v. Nassau Electric R. R. Co., 157 N. Y. 453.

The foundation of the Ingersoll case was, as in the present case, a contract for the operation of a railroad entered into subsequent to the enactment of section 78 of the Railroad Law. It was sought to subject the railroad companies, who were parties to the contract, to the operation of sections 91 and 102 of the Railroad Law, which, if applicable, would seem to require the lessee company to obtain the consent of the abutting property-owners before it could operate the leased line — a requirement which did not exist under the law as it stood prior to the enactment of the General Railroad Law in 1884. Parker, Ch. J., held that article 4 of the Railroad Law (which embraces sections 91 and 102, which were in question in the Ingersoll case, and section 104, which is in question in the present case) was not intended by the Legislature to apply to corporations which had acquired their franchises and constructed their railroads prior to the enactment of the law, because otherwise the legislation would be unconstitutional, and that such corporations had a vested right to enter into contracts of lease

which could not be taken away or diminished by subsequent legislation.

It was also held that the act of 1839, entitled "An act authorizing railroad companies to contract with each other " (Laws of 1839, chap. 218) has been continued in force from the time of its enactment to its incorporation into section 78 of the Railroad Law; that it applies to both steam and surface railroad corporations, and authorizes both traffic agreements and leases, and that as against rights which had become vested it remains unaffected by subsequent constitutional provisions.

The real question presented in the Ingersoll case was whether one railroad company, which had leased a portion of the lines of another, could operate its cars over such portion without a specific consent to such operation by the abutting owners, who had already given their consent to the building and operation of the leased portions. In concluding that no such second specific consent was necessary, Chief Justice Parker followed two lines of argument. The first of these was based upon chapter 218 of the Laws of 1839.

The second, which is found on pages 469 to 471 of the opinion, proceeded upon the theory that a road which ran its cars over portions of the lines of another, by virtue of a lease, was not " operating " a railroad, as that term is employed in the Constitution and in sections 91 and 102 of the Railroad Law.

Such being the case, it is impossible to know whether any of the other three judges of the Court of Appeals, who concurred in the result, agreed with the chief justice in the views which he expressed in regard to chapter 218 of the Laws of 1839. Mr. Justice Vann, on the other hand, dissented most emphatically on that point. Moreover, in the Ingersoll case the court was considering not a question of fares that might be charged, but a question which related to the right of a railroad to operate its road at all, and which, if decided in the negative, would have prevented a corporation from the substantial enjoyment of its franchises.

The distinction between the two classes of questions has been frequently pointed out. People ex rel. Kimball v. Bos-

ton & Albany R. R. Co., 70 N. Y. 569; cited in 111 id. 48; Id. 58; Id. 140; 117 id. 11; Id. 20; Pearsall v. Great Northern Railway, 161 U. S. 646. In People ex rel. Kimball v. B. & A. R. R. Co., *supra,* it was said, and in 111 N. Y. 140 reiterated, that " railroad corporations hold their property and exercise their functions for the public benefit, and they are, therefore, subject to legislative control. The legislature which has created them may regulate the mode in which they shall transact their business, the price which they shall charge for the transportation of freight and passengers, etc.  \* \* \* . It may make all such regulations as are appropriate to protect the lives of persons carried upon railroads or passing upon highways crossed by railroads. All this is within the domain of legislative power, although the power to alter and amend the charters of such corporations has not been reserved.

" Such legislation violates no contract, takes away no property, and interferes with no vested right."

In Mayor v. Twenty-third Street Railway Co., 113 N. Y. 311, it was held that the act of 1873 (Laws of 1873, chap. 647), requiring the Bleecker Street and Fulton Ferry R. R. Co., a street railroad corporation organized under the General Railroad Act (Laws of 1850, chap. 140), to pay into the treasury of the city of New York one per cent. of the gross receipts instead of a license fee as before prescribed (Laws of 1873, chap. 199), was constitutional; that it must be deemed an alteration and amendment of the charter of the company, and so is within the power reserved to the Legislature by the general act, the provisions of the Revised Statutes to which corporations organized under said act are by its terms made subject and the State Constitution (art. 8, § 1). And it was further held that when said company leased its property rights, privileges and franchises to the defendant, the latter was bound to pay the percentage although the lease imposed upon it no such obligation.

Article 8, section 1 of the Constitution of the State of New York expressly provides, and since 1846 has provided as follows: " Corporations may be formed under general laws; but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the Legis-

lature, the objects of the corporation cannot be attained under general laws.  All general laws and special acts passed pursuant to this section may be altered from time to time or repealed."  And section 1 of chapter 140 of the Laws of 1850, entitled "An Act to authorize the formation of railroad corporations " provides that every corporation formed under it shall be subject to the provisions contained in title 3 of chapter 18 of the first of the Revised Statutes, the eighth section of which reads as follows:  " Section 8.  The charter of every · corporation, that shall hereafter be granted by the Legislature, shall be subject to alteration, suspension and repeal, in the discretion of the Legislature."  This power has remained in the Legislature ever since.  In view of the existence of these constitutional and statutory provisions at the time of the formation of the corporations which subsequently were consolidated with the Metropolitan Street Railway Company, and at the time of the formation of the present Metropolitan Street Railway Company under the provisions of the Railroad Law, none of the said corporations possessed any vested rights in respect to the maintenance of a certain rate of fare which was beyond legislative control.  The cases above referred to clearly show, when read in full, that even vested rights may to some extent be interfered with by the Legislature in the exercise of the police power or the right of eminent domain of the State.  This was conceded by Parker, Ch. J., in Ingersoll v. Nassau Electric R. R. Co., 157 N. Y. 463.  In this connection it may also be pointed out that, although the opinion of Parker, Ch. J., did not proceed upon that ground, the right to operate the road by the Atlantic Avenue Railroad Company, as discussed by that learned jurist, in fact dated back to the provisions of chapter 256 of the Laws of 1832 and chapter 178 of the Laws of 1834.  It now having been sufficiently shown that the right of the present Metropolitan Street Railway Company, at the time of its consolidation with its constituent companies, to operate the lines then acquired was not beyond legislative regulation as to the mode or manner of such operation, and that a statute regulating the rate of fare is a legislative exercise of the police power inherent in the State, it remains to be seen

whether section 104 of the Railroad Law as amended applies to the case at bar.  Upon this point it is contended that the said section is inapplicable because it applies only to traffic contracts under which each company retains its line, and not to leases, and that, therefore, in every aspect of the case it is inapplicable to the defendant.  The Appellate Division of the First Department in Mendoza v. Metropolitan Street Railway Company, 48 App. Div. 65, and same case on reargument, 51 id. 433, had occasion to consider the question of the applicability of section 104 to leases to some extent, and found that the " contract " therein referred to is the contract authorized by section 78 of the same law, which, as shown, both by the context of that section and its judicial construction, includes a lease.  The case went off on a point of pleading, but it turned on the question whether either party to a street railroad lease is required to extend the universal transfer system to lines which it subsequently acquires, and which are not embraced within any lease or other contract.  O'Brien, J., upon the original argument (48 App. Div. 65), said: " The right of a passenger to a continuous trip for a single fare extends not alone to the routes or lines of the leased road, but also to such routes as, at the execution of the lease, were owned, controlled or operated by the corporation to whom the lease was made."  Rumsey, J., on motion for reargument (51 App. Div. 433), said: " Strictly speaking, when one railroad leases the road of another, the only road embraced in the contract is the one leased, but as the power to lease is derived from the authority given to one railroad corporation operating or owning a railroad to contract with another such corporation for the use of their respective roads, it is necessarily to be inferred that the roads embraced within that contract are the roads operated or leased by the two roads between whom the contract is made."

Similarly, Hirschberg, J., delivering the opinion of the Appellate Division for the Second Department, referred *arguendo* to this section as relating " to transfers where passengers are carried over connecting roads operated together under either leases or traffic contracts."  Barnett v. Brooklyn Heights R. R. Co., 53 App. Div. 438.

Misc.]      Supreme Court, Appellate Term, January, 1904.

The principle of these decisions has been followed in a series of Municipal Court decisions, which were not only carefully considered, but, in some instances, also confirmed by abandonment of appeals taken therefrom.

In view of the defendant's earnest contention, in the present case, however, that after all it was only assumed in the Mendoza case that section 104 applies to leases as well as traffic contract, the inquiry will be further pursued. In chapter 140 of the Laws of 1850, there can be found no provision which extends to corporations formed under that law the power of leasing previously conferred upon railroad corporations by chapter 218 of the Laws of 1839. On the other hand, the powers which corporations formed under chapter 140 of the Laws of 1850 have, and the powers which such corporations have not, are very clearly set forth in the act. See Laws of 1850, chap. 140, §§ 1, 28. Corporations formed under that law have no other powers than those specified in the act of 1850, and those specified in Part 1, Revised Statutes, title 3, chapter 18. Among those powers the power of leasing the company's road cannot be found.

In view of the foregoing facts it would appear that the principle that " a grant of power to a corporation is to be strictly construed against it, and nothing will be presumed to pass by the grant unless it be expressed in clear and unambiguous language " would apply and would result in depriving any railroad company, formed under chapter 140 of the Laws of 1850, of the power to make a lease of its railroad, unless such power had been conferred upon it by some act of the Legislature passed after the passage of chapter 140 of the Laws of 1850. Pearsall v. Great Northern R. Co., 161 U. S. 646. Prior to the Street Railroad Law of May 6, 1884, it was not settled whether street railroads had the right to lease each other. The power was derived from the act of 1839, chapter 218, entitled "An Act authorizing Railroad Companies to contract with each other, viz: It shall be lawful hereafter for any railroad corporation to contract with any other railroad corporation for the use of their respective roads, and thereafter to use the same in such manner as may be prescribed in such contract. But nothing in this act con-

tained shall authorize the road of any railroad corporation to be used by any other railroad corporation, in a manner inconsistent with the provisions of the charter of the corporation whose railroad is to be used under such contract."

While the language of this statute was not entirely apt for that purpose, it was extended by judicial construction so as to include the power to lease.

Section 15 of the Street Railroad Act of May 6, 1884 (chap. 252), authorized any street surface railroad company to lease to any other such company authorized to run upon its route, but ended with the following proviso:   "But nothing in this section shall be construed to authorize any railroad company in cities of over three hundred thousand population, to lease its rights or franchises to any other company in said cities which owns and operates a road thereto."

The saving clause (§ 18) preserved "any rights heretofore acquired under the laws of this state by any horse railroad company" and "any right of any existing street railroad company to construct, extend, operate and maintain its road in accordance with the terms and provisions of its charter."

The prohibition against the leasing of parallel lines was removed, so far as the old city of New York was concerned, by the act of 1885 (chap. 305), entitled "An Act authorizing street surface railroad companies to contract with each other, and providing for a proper system of transfer of passengers," which reads as follows:   "§ 1. It shall be lawful hereafter for any street surface railroad company, or any corporation owning or operating a street surface railroad or railroad route, to contract with any other such company or corporation for the use of their respective roads or routes or any portion thereof, subject to the provisions, restrictions and conditions hereinafter stated, and thereafter to use or to permit the use of the same in such manner as may be prescribed in such contract.   But nothing in this act shall authorize the road or route of any railroad corporation to be used or operated by any other railroad corporation in a manner inconsistent with the provisions of the charter of the corpora-

tion whose railroad or railroad route is to be used or operated under such contract."

" § 4. Each and every company entering into any con-·tract under the power conferred by this act shall carry or permit any other party to such contract to carry between any two points on the railroads or portion thereof embraced within such contract, any passenger desiring to make one continuous trip between such points for one single fare not higher than the fare lawfully chargeable by either of such companies for an adult passenger; and each and every such company shall, upon demand and without extra charge, give to each passenger paying one single fare a transfer entitling such passenger to one continuous trip to any point or any portion of any railroad embraced within such contract, to the end that the public convenience may be promoted by the operation of the railroads embraced within such contract to the extent of their inclusion therein substantially as a single railroad with a single rate of fare. For every refusal to comply with the requirements of this section the company so refusing, and having contracted as aforesaid, shall forfeit to the aggrieved party the sum of fifty dollars, which may be recovered in any court of competent jurisdiction. This act shall not apply to cities having less than eight hundred thousand population.

" § 5. All acts and parts of acts inconsistent with the provisions of this act are hereby repealed."

The act of 1885 thus absolutely repealed all prior legislation on the subject of street railroad leases in the old city of New York, containing no saving clause.

Its provisions have ever since remained upon the statute books. The General Railroad Law of 1890, contained a special article (art. 4), covering the subject of street railroads, while some general provisions, applicable to them among others, were left in or have since been added to the earlier articles.

The law of 1839 was substantially repeated in section 78 of the new revision, while the provision of the Street Railroad Law of 1890 against leasing of parallel lines was continued and made general by section 80. The first section of the act. of 1885 was continued as section 103 and the third section as

section 104; while the fourth section, establishing the public right of free transfer, was substantially continued as section 105.

The limitation of these provisions of 1885 to cities with a population of 800,000 or more was continued by section 103, and Brooklyn, upon the Federal census of 1890, was brought under them. In 1892 the Railroad Law was revised, and in the revisions the paragraph-shifting occurred which has caused the apparent obscurity in the present law. The limitation to cities of 800,000 population or over was stricken out.

Sections 103 and 104, having thus been rendered unnecessary, were stricken out where they stood and consolidated with section 78. A new section 103 was introduced, dealing with an entirely different subject, and the old section 105 was pushed up and renumbered as section 104.

It also became necessary to insert a new provision in order to prevent the right of free transfer for a single fare from fastening itself upon long lines of country railroads. This led to the insertion in the revision of 1892 of the final proviso that the free transfer right " shall apply only to railroads wholly within the limits of any one incorporated city or village."

Enough has now been said to demonstrate that section 104, as it now stands, does not apply exclusively to traffic contracts, but also to leases.

The question now remains as to the kind of corporations to which the words: " Every such corporation entering into such contract " apply, especially as the Interurban Street Railway Company is not a railroad corporation, but a corporation owning and operating a street surface railroad or railroad route, and has been organized under the Stock Corporation Law. A cursory examination of the provisions of chapter 218 of the Laws of 1839, and of the subsequent laws in regard to the lease of railroads and railroad routes that have been enacted by the Legislature from that time until 1893, will emphasize the distinction that exists between " railroad " corporations and corporations which, while not railroad corporations, have the right to operate railroads.

Railroad companies have been known in this State from

the earliest times, but corporations which are not themselves formed under any railroad act but have the power to operate railroads, are a much more modern form of corporation and an essentially different form.

Chapter 218 of the Laws of 1839 reads as follows:

" Section 1. It shall be lawful hereafter for any railroad corporation to contract with any other railroad corporation for the use of their respective roads," etc.

Chapter 252 of the Laws of 1884 contains the following provision:

" § 15. It shall be lawful for any street surface railroad company or companies to lease, or transfer its or their right, subject to all its or their obligations in respect thereof, to run upon or to use any portion of its or their railroad tracks to any other street surface railroad company authorized to run upon such route," etc.   It will be noticed that neither of said statutes authorized any railroad company to lease its line to any other corporation except a railroad corporation. In 1885, however, by chapter 305 of the laws of that year, an entirely new power was given to street railroad companies. The following is a quotation from section 1 of that act, viz:

" Section 1. It shall be lawful hereafter for any street surface railroad company, or any corporation owning or operating a street surface railroad or railroad route, to contract with any other such company or corporation for the use of their respective roads or routes or any portion thereof," etc.   At the same time, by section 4 of the same act, there was imposed upon street surface railroad corporations which availed themselves of the provisions of section 1, the obligation to issue transfers and charge single fares.   When the Railroad Law was enacted by chapter 565 of the Laws of 1890, the distinction which has already been pointed out was preserved.   We find, therefore, repeated in section 78 of chapter 565 of the Laws of 1890, the provisions of chapter 218 of the Laws of 1839:   " Section 78. Lease of road.—Any railroad corporation may contract with any other railroad corporation for the use of their respective  roads," etc.

We also find repeated in section 103 of chapter 565 of the Laws of 1890 the provisions of chapter 305 of the Laws of

1885: " Section 103. Corporations may lease or contract with each other for the use of road.—Any street surface railroad corporation or any corporation owning or operating any such railroad or railroad route, in any city having a population of eight hundred thousand or more, may contract with any other such corporation for the use of their respective roads or routes in such city," etc. And in section 105 of the Laws of 1890, we also find repeated the condition that every such corporation entering into such contract shall issue transfers, etc. The foregoing observations make it obvious that the Legislature recognized clearly the distinction between a railroad corporation, pure and simple, and a corporation which, while formed under some other law than a railroad law, had the right to operate a railroad or railroad route, having first given the railroad corporation the right to lease their lines to other railroad corporations, and recognizing that this power, under familiar principles of law, would be construed strictly against such companies, the Legislature in 1885 saw the advisability of going a step further in the same direction.

The Legislature, therefore, in 1885, conferred on street surface railroad corporations the right to lease their railroads or railroad routes to other corporations owning or operating such routes, whether the latter were railroad companies or not. When the laws were revised in 1890, the distinction between the two classes of companies and the power given to each were preserved in sections 78 and 103, as above pointed out. When the Railroad Law was amended in 1892 by chapter 676 of that year, section 103 was omitted and section 78 was made to read as follows: " Section 78. Lease of road.—Any railroad corporation or any corporation owning or operating any railroad or railroad route within this State, may contract with any other such corporation for the use of their respective roads or routes or any part thereof," etc. Section 78, with slight verbal changes which are of no importance here, has remained the law to the present time. We see then in section 78, as finally amended, the two different powers which were previously embodied in different sections of the law, united into one. If sec-

tion 103 of the Railroad Law had not been eliminated by chapter 676 of the Laws of 1892, and if section 78 had not taken the place of section 103, the lease by the Interurban Street Railway Company of the lines owned and operated by the Metropolitan Street Railway Company could not have been made at all.  Section 103 apparently only authorized a railroad owning or operating a route in a city to lease similar lines from another railroad.  Defendant, having been organized under the Stock Corporation Law, must have resort to section 78 of the Railroad Law to justify its operation under lease of the lines of the old Metropolitan Street Railroad Company.  It relies on section 78 for its very existence as an operating railroad in the city of New York.  If the provisions of chapter 218 of the Laws of 1839 were of themselves sufficient to confer upon all corporations, whether railroad companies or not, the right to lease such railroad routes as they might own to similar corporations, then there would have been no reason for the Legislature, in its wisdom, enacting section 1 of chapter 305 of the Laws of 1885, and perpetuating the distinction between that section and chapter 218 of the Laws of 1839 in the provisions of sections 78 and 103 of the Railroad Law of 1890.  Moreover, the provisions of chapter 218 of the Laws of 1839, in so far as they may be construed as conferring upon a street railroad corporation formed under chapter 140 of the Laws of 1850 the unconditional right of leasing its road to another railroad corporation, have been repealed by section 5 of chapter 305 of the Laws of 1885.  Such being the state of the law the defendant cannot escape the obvious and plain meaning of section 104 of the Railroad Law.  The concluding sentence that the provisions of the section shall only apply to railroads wholly within the limits of any one incorporated city or village refers to railroads and not to corporations.  It was added, when the right to lease was extended to every corporation owning a railroad within this State, to prevent the right of transfer for a single fare from being fastened upon long lines of country railroads.  The true construction of section 104, therefore, is that it applies to railroad corporations and all other corporations within this State which, while formed under some other than the Rail-

road Law, have the right to own or operate a railroad within this State, and that it applies to leases as well as traffic contracts, and that the duty of giving transfers for a single fare shall apply only to such railroads as are wholly within the limits of any one incorporated city or village.  That the Legislature intended section 104 to apply to all street railroad corporations without regard to the law under which they were incorporated or the date of their incorporation appears by the amendments which were made to section 90 of the Railroad Law by chapter 434 of the Laws of 1893, and by chapter 933 of the Laws of 1895.  Section 90 of the Railroad Law as amended by said chapters reads as follows:

" Section 90.  Street surface railroads; general provisions. — The provisions of this article shall apply to every corporation which, under the provisions thereof, or of any other law, has constructed or shall construct or operate, or has been or shall be organized to construct or operate, a street surface railroad, or any extension or extensions, branch or branches thereof, for public use in the conveyance of persons and property for compensation, upon and along any street, avenue, road, highway or private property, in any city, town or village, or in any two or more civil divisions of the state, and every such corporation must comply with the provisions of this article."  Under the true construction of the section 104, as above stated, the Metropolitan Street Railway Company formed in 1895 had no right to make the lease in question, and the defendant had no right to accept it, except upon the conditions imposed by said section.  The foregoing considerations are sufficient for a proper disposition of the appeal in the present case, and yet it may be well to refer to still another point.  The first Metropolitan Street Railway Company of 1893 was formed by a consolidation of companies then owning or operating street surface railroads within the limits of the city of New York.

This consolidation was effected under the provisions of chapter 565 of the Laws of 1890 as amended.  Before the passage of said chapter, such companies could not be consolidated.  By section 90 of the Railroad Law, as amended by chapter 434 of the Laws of 1893, all the provisions of

chapter 565 of the Laws of 1890, as amended, became binding upon the Metropolitan Street Railway Company thus formed, and its constituent companies. By taking advantage of the consolidation provisions of the law both the said Metropolitan Street Railway Company and its constituent companies became subject to all the provisions of the Railroad Law and waived the privileges in regard to fares, if any, possessed by them under prior laws. The consolidation agreement on its face says that it was made under the Railroad Law. The same remarks apply to the companies which executed the consolidation agreement of May 18, 1894, and to the second Metropolitan Street Railway Company formed by such agreement, and also to the companies which executed the consolidation agreement of November 7, 1895, and to the present Metropolitan Street Railway Company formed by the agreement last referred to. When, therefore, the statutory provisions permitting these consolidations upon certain specified conditions are read, as they must be read in connection with sections 78 and 104 of the Railroad Law, the conclusion seems inevitable that each of said consolidation agreements constituted a contract within the meaning of that term as found in section 104 under which the duty arose to furnish transfers, and if that is so, the present Metropolitan Street Railway Company was under such duty at the time of the execution of the lease to the Interurban Street Railway Company, and the latter, by virtue of said lease, could acquire no greater rights than its lessor had. Upon the whole case the judgment appealed from was erroneously placed upon the ground that the provisions of section 104 of the Railroad Law did not apply to the defendant, and it, therefore, must be reversed, and a new trial granted, with costs to the appellant to abide the event.

Inasmuch, however, as the question involved is of great public importance, the respondent may have leave to appeal to the Appellate Division.

Gildersleeve, and Greenbaum, JJ., concur.

Judgment reversed, and new trial granted, with costs to appellant to abide event. Leave to respondent to appeal to Appellate Division.